MOORE, Judge.
In case no. 2080591, G.P., the maternal grandmother of A.P., appeals from the judgment of the Houston Juvenile Court terminating the parental rights of A.P.’s mother and father. We dismiss her appeal for lack of standing. In case no. 2080606, A.P.’s father, D.S., also appeals from the judgment terminating his parental rights to A.P. We affirm the judgment. We have consolidated these appeals for the purpose of issuing one opinion.

Facts and Procedural History

A.P. (“the child”) was born to O.P. (“the mother”) and D.S. (“the father”) on March 18, 1999. It was undisputed at trial that, from the time the child was five months old, G.P. (“the grandmother”) had been the child’s legal guardian. It was further un *115 disputed that, in May 2007, the grandmother had left the child in the care of her niece, A.B., and A.B.’s husband, R.B., while the grandmother was in the hospital. During that same period, A.B. and R.B. had the child admitted into Laurel Oaks Behavioral Health Center. When the child was discharged, the Houston County Department of Human Resources (“DHR”) took the child into their custody. On May 20, 2008, the father filed a petition for custody of the child. On July 8, 2008, DHR filed a petition to terminate the mother’s and the father’s parental rights to the child. Subsequently, the mother filed a consent to the termination of her parental rights. On September 11, 2008, the grandmother filed a petition for custody of the child. The juvenile court held a trial on the father’s, the grandmother’s, and DHR’s petitions.
At trial, Margaret Riley, a DHR foster-care worker who had been assigned to the child’s case since May 2007, testified that, when she initially received the child’s case, the child was about to be discharged from Laurel Oaks and there were no relatives available to take custody of the child. She testified that, at that time, the grandmother was unable to deal with the child’s behavioral problems or meet the child’s emotional needs because of her physical limitations.
Riley testified that, in September 2007, she contacted the father and informed him that the child had been placed in foster care and invited the father to meet with her. According to Riley, she later found out that there was an open protective-service case involving the father and his common-law wife, M.R. Riley also testified that the father had admitted that he had had no contact with the child, that he had issues with alcoholism and domestic violence, and that one of his and M.R.’s children acted out sexually. Based on that information, Riley determined that the father was not a potential resource for the child at that time.
Riley also testified that, in May 2008, she assisted the father with his custody petition and his affidavit of substantial hardship so that he could obtain legal representation. According to Riley, the father told her at that time that he did not have a place to live. She testified that she had informed the father that he should advise her when he obtained housing. Riley testified that she had followed up with the father and that he had advised her that he had moved back in with M.R. a couple of months before.
Riley testified that DHR had not facilitated introducing the father to the child because Linda Varner, the child’s therapist, had advised against doing so. Riley further testified that she was concerned about the father’s having custody of the child because the child has no attachment to the father, because of the father’s history of domestic violence, and because the father’s 11-year-old child has a history of acting out sexually.
Riley testified that the mother had had a positive drug screen in July 2008 and that the mother lives with a man who does not approve of her interacting with the child, who had used a racial slur against the child, and who had been physically abusive to the child. The mother admitted at trial that she could not take care of the child.
Riley testified that the child had had visitation at the grandmother’s home on weekends until it had been reported that the child had started a fire during a visitation in January 2008. Riley testified that the child had also started a fire in the grandmother’s home in 2004. Riley testified that the grandmother had minimized the safety threat that the child’s behavior posed and had failed to report the 2008 incident to her and the child’s foster par *116 ent. Following the January 2008 incident, the grandmother had supervised visitation with the child for one hour each week.
Regarding the possibility of the grandmother’s having custody of the child, Riley testified that she was concerned that the grandmother would not be able to deal with the child’s behavioral problems or meet the child’s emotional needs and that the lack of supervision in the grandmother’s home could pose a safety threat. Riley testified that the grandmother had told her that she falls asleep while smoking cigarettes and that the cigarettes drop onto the furniture. Riley also testified that, although the grandmother can walk, she prefers using her wheelchair. Riley testified that the grandmother’s limited mobility is a concern because the grandmother lives on a busy road and because the child is very active and has exhibited a defiant attitude. Riley also testified that, based on the indication that the child has been exposed to trauma, she does not believe the grandmother has sufficient capacity to be a protective caregiver. Riley testified that the grandmother had been invited to participate in the child’s counseling but had not done so.
Riley further testified, and the grandmother admitted, that, although the grandmother had moved into her mobile home several months before trial, at the time of the trial, the grandmother had not unpacked, there were no beds set up in the house, and the kitchen sink and lower cabinets had been removed. The grandmother testified that her landlord was going to replace the sink and the cabinets, but he had not done so at the time of the trial.
Crystal Strickland testified that she had served as the protective-service worker for the children of the father and M.R. from June 2007 to June 2008. She testified that DHR had initially become involved with the father’s family because of concerns that domestic violence had occurred in front of the child. According to Strickland, DHR’s assessment had raised concerns about the father’s alcohol abuse; concerns later arose about M.R. and the father’s older child acting out sexually. Strickland testified that there was no indication that the older child’s sexually acting out had been a result of the father’s or M.R.’s actions. Strickland testified that the case had been closed because M.R. and the children were stable, the children were in counseling, and the father was not in the home. She testified that, if the father had been in the home, the case probably would not have been closed.
Linda Varner, a children’s and family therapist, testified that she had counseled the child for two years. At the time Var-ner began counseling the child, the child was engaging in dangerous activities, was being disrespectful, was misbehaving at school, and was basically out of control. Varner testified that the child had set fires and had urinated in corners. She testified that, although the child is better now, there are still many issues to be addressed. She testified that the child is still very troubled, and it was her recommendation that the child be watched 24 hours a day, 7 days a week. Varner testified that the grandmother had not provided the supervision that the child required.
Varner testified that the child had disclosed that he had been physically and sexually abused by R.B., the husband of the grandmother’s niece, who lived next door to the grandmother. Varner testified that she believes that the abuse took place. Further, Varner testified that the child had informed her that he had told the grandmother about the abuse. The grandmother denied that the child had informed her about the sexual abuse; she testified that she knew only that R.B. or A.B. had spanked the child at the grandmother’s *117 request because it was physically difficult for her to spank the child. According to Varner, the child had been physically abused when the grandmother sent the child to be disciplined by R.B. Varner further testified that the grandmother had told the child that, if he did not behave, he was going to be adopted.
Varner testified that, in her opinion, it is not in the best interest of the child to initiate contact between the child and the father based on the fact that the child is currently dealing with an abuse issue and has a history of people coming in and out of his life. She testified that introducing the child to the father would only add to the trauma the child is experiencing.
C.J., a therapeutic foster parent, testified that the child had been in her care for almost two years. C.J. testified that the child is very active and sneaky and that he will get up during the night and do things he is told not to do. She testified that there is an alarm on the child’s door to notify her if the child is up at night. C.J. testified that the child’s behavior problems have included hogging food, fighting, cutting chairs, scratching her automobile, and threatening to kick out her windows. C.J. testified that she is physically active and that, if she were not, she would not be able to look after the child. C.J. testified that the child had told her that his grandmother was getting a lawyer and that they were going to go to court.
The father testified that, for almost one year, he had been back living with his common-law wife, M.R., and their two children, who were ages 11 and 6 years at the time of the trial. He testified that he and M.R. have had domestic-violence issues and that he had an alcohol-abuse problem in the past. He testified that he had been charged with domestic violence in 2007 and that, two years before the trial, M.R. had obtained a protection-from-abuse order against him. He also testified that he had been arrested for driving under the influence of alcohol twice, with the most recent arrest being in 2003. The father testified that, at the time of trial, he was not suffering from an alcohol problem. The father also testified that his oldest child had acted out sexually and that his and M.R.’s children were both in counseling.
The father testified that the mother had brought the child to see him the day after the child had been born. He testified that, at first, he had gone to visit the child at the mother’s house but that, eventually, the mother had stopped communicating with him and had told him not to try to visit the child. The father admitted, however, that no one had kept him from filing a petition for custody of the child. The father testified that he had not known that the child was living with the grandmother. The father also testified that he had been paying child support for the child for two or three years and that he had been employed at the same job for two years.
The father testified that he wants custody of the child but that he understands that, because of the child’s problems, it is not in the best interest of the child that he take custody of the child immediately.
The father’s common-law wife, M.R., testified that she and the father had been in a relationship for 12 years. She testified that, at the time of trial, the father had not drunk alcohol in many months and that there were no more domestic-violence issues. She testified that the father had been attending Alcoholic Anonymous meetings and group counseling; the father testified that he attended group counseling three nights a week for three hours each session. M.R. also testified that she had reported to DHR that her children had had sexual contact with one another. She testified that there is an alarm on her older child’s bedroom door as a result of *118 that issue. She testified that there had been no further incidents of that nature since the initial incident two or three years before trial. M.R. testified that she does not work outside the home and that she would be able to supervise the child.
The grandmother testified that she began taking the child to a psychologist when he was three years old and that the child had been prescribed medication for attention deficit/hyperactivity disorder. She also testified that she had put the child in day care so that he would have children to play with and that she had hired an after-school tutor for him. She testified further that she had taken the child to all his practices and games for baseball and basketball. Although the grandmother admitted that she had had trouble controlling the child, she also testified that she wanted to have the child back in her custody. She testified that she had learned a lot from C.J., the child’s foster parent, about caring for the child, including following through with discipline and using discipline other than spankings.
The juvenile court entered a judgment terminating the parental rights of the mother and the father; the judgment also impliedly denied the grandmother’s and the father’s custody petitions. The grandmother and the father separately appealed.

Discussion

Cose No. 2080591 — The Grandmother’s Appeal
In case no. 2080591, the grandmother argues that the juvenile court erred in finding the child dependent and in finding that there were no viable alternatives to terminating the parents’ parental rights. She does not argue that the juvenile court erred in denying her petition for custody. In response to the grandmother’s arguments, DHR argues that the grandmother lacked standing to appeal the judgment terminating the parents’ parental rights. We agree. In D.M. v. Walker County Department of Human Resources, 919 So.2d 1197 (Ala.Civ.App.2005), this court addressed an appeal in which a child’s aunt challenged a juvenile court’s decision to terminate the parental rights of the child’s parents; this court stated:
“In her brief on appeal, the aunt has not argued that the juvenile court erred in denying the April 14, 2004, joint petition for custody to which she was a party. Rather, the aunt argues issues that pertain only to the propriety of that part of the juvenile court’s September 29, 2004, judgment in which the court ordered that the parents’ parental rights be terminated. However, the aunt has no legally protected parental right with regard to the children at issue. See State v. Property at 2018 Rainbow Drive, [740 So.2d 1025 (Ala.1999) ]. Further, the aunt may not assert arguments on behalf of the parents.
“ ‘ “ ‘[A] litigant may not claim standing to assert the rights of a third party.’” Ex parte Izundu, 568 So.2d 771, 772 (Ala.1990) (quoting Jersey Shore Med. Ctr.-Fitkin Hosp. v. Estate of Baum, 84 N.J. 137, 417 A.2d 1008 (1980)). “A party lacks standing to invoke the power of the court in his behalf in the absence of a ‘concrete stake in the outcome of the court’s decision.’ ” 568 So.2d at 772 (quoting Brown Mech. Contractors, Inc. v. Centennial Ins. Co., 431 So.2d 932, 937 (Ala.1983)).’
“Lott v. Eastern Shore Christian Ctr., 908 So.2d 922, 932 (Ala.2005). We conclude that the aunt lacks standing to prosecute the issues raised in her brief on appeal; therefore, we must dismiss her appeal. Goodyear Tire & Rubber *119 Co. v. Moore, 900 So.2d 1239 (Ala.Civ. App.2004).”
919 So.2d at 1205-06 (footnote omitted).
Similarly, in the present case, the grandmother has no legally protected parental rights in the child, and she cannot assert arguments on behalf of the child’s parents. We conclude that the grandmother lacks standing to prosecute the issues raised in her brief; according, we dismiss her appeal.
Case No. 2080606 — The Father’s Appeal
In case no. 2080606, the father argues that the juvenile court erred in terminating his parental rights to the child because, he says, there was not clear and convincing evidence presented upon which the juvenile court could find (1) that grounds for termination of his parental rights existed, (2) that no viable alternatives were available, and (3) that reasonable efforts had been made to rehabilitate him.
Section 26-18-7, Ala.Code 1975,[1] provided, in pertinent part:
“(a) If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
“(1) That the parents have abandoned the child.... ”
Section 26-18-3(1), Ala.Code 1975,[2] defined “abandonment” as
“[a] voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the parent, of his presence, care, love, protection, maintenance or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent.”
In the present case, the evidence was undisputed that the father had been absent from the child’s life since the child was an infant. Although the father testified that the mother had told him not to visit the child, he admitted that no one had prevented him from filing a petition for custody of the child before May 2008, almost 10 years after the child’s birth. The father failed to establish a relationship with the child and failed to support the child for most of the child’s life. Accordingly, we conclude that there was clear and convincing evidence that grounds for termination of the father’s parental rights, 1.e., abandonment, existed. Furthermore, at the time of the trial, the father was an alcoholic with recent domestie-violenee problems, and the father’s oldest child had acted out sexually. Based on that information, the juvenile court could have prop *120 erly concluded that the father was “unable or unwilling to discharge [his] responsibilities to and for the child.” § 26-18-7(a), Ala. Code 1975.
With regard to the father’s second argument — that no viable alternatives were available — the juvenile court “must properly consider and reject all viable alternatives to a termination of parental rights.” B.M. v. State, 895 So.2d 319, 331 (Ala.Civ.App.2004). In the present case, the father argues that a viable alternative would be to allow him “to form a relationship with [the] child, which could [lead] to the child eventually being in the loving home of [the father].” However, at trial, the child’s counselor testified that she did not recommend that the child be introduced to the father at that time because it would add to the trauma that the child was already experiencing. Riley testified that she was concerned about the father’s having custody of the child because of the father’s history of alcohol abuse and domestic violence, as well as his oldest child’s history of acting out sexually. The father even acknowledged his understanding that it would not be in the child’s best interest for him to take custody of the child immediately. Thus, the child would be forced to remain in foster care awaiting the mere possibility that the circumstances would permit the father to take custody of the child at some point in the future.
“In R.L.B. v. Morgan County Department of Human Resources, 805 So.2d 721, 725 (Ala.Civ.App.2001), this court held that maintaining a child in foster care indefinitely is not a viable alternative to termination of parental rights.” T.G. v. Houston County Dep’t of Human Res., 39 So.3d 1146, 1152 (Ala.Civ.App.2009). Thus, we conclude that maintaining the child in foster care while the father built a relationship with the child was not a viable alternative in this case.
Finally, with regard to the father’s argument that DHR had failed to offer him any services, we note that DHR is not required to make reasonable efforts to rehabilitate a parent who has abandoned his or her child. Ala.Code 1975, § 26-18-7(a)(1).
Based on the foregoing, we affirm the juvenile court’s judgment terminating the father’s parental rights to the child.
2080591 — APPEAL DISMISSED.
2080606 — AFFIRMED.
THOMPSON, P.J., and PITTMAN, BRYAN, and THOMAS, JJ., concur.

On Applications for ReheaHng

. By Act No. 2008-277, Ala. Acts 2008, the Alabama Legislature, among other things, amended and renumbered § 26-18-7, Ala. Code 1975, and enacted the Alabama Juvenile Justice Act ("the AJJA"), codified at § 12 — 15— 101 et seq., Ala.Code 1975. The effective date of the AJJA is January 1, 2009; the father has not asserted that the AJJA applies in this case.

. Section 26-18-3, Ala.Code 1975, was repealed by Act No. 2008-277, Ala. Acts 2008. See note 1, supra.