THOMPSON, Presiding Judge.
The Madison County Department of Human Resources (“DHR”) filed a petition to terminate the parental rights of K.E.L. (“the mother”) and J.M. (“the father”) to their minor child, S.M. (“the child”). The juvenile court conducted the termination hearing over the course of two days in December 2012 and early January 2018. On January 15, 2013, the juvenile court entered a judgment terminating the parents’ parental rights.
The father filed a postjudgment motion, and he immediately filed a notice of appeal. The notice of appeal was held in abeyance pending a ruling on the post-judgment motion. Rule 4(a)(5), Ala. R.App. P. On February 4, 2013, the juvenile court denied the father’s postjudgment motion, and the father’s appeal became effective.[1] Rule 4, Ala. R.App. P.
The record on appeal indicates the following pertinent facts. The parents were married and had two young children; those children, both of whom have special needs and are developmentally delayed, were toddlers when the child at issue in this appeal was born July 5, 2011. Immediately following his birth, the child had surgery for omfalocele, which is a condition that causes the intestines to be located outside the body. The child has a number of other health conditions. The child’s foster mother, S.A. (“the foster mother”), testified that the child was born without an anus, that his pelvis is unfused, and that his ears and genitals are deformed. In addition, the child has epispadias (his urethra is in his abdomen), a heart defect, and a Chromosome 17 duplication, which causes developmental delays and mental retardation.
Karen Jackson, a DHR social worker, testified that the hospital at which the child was born called DHR a few days after the child’s birth to report concerns about the parents’ abilities or willingness to address the child’s multiple medical needs. Jackson testified that the mother was initially interested in placing the child for adoption but that, instead, she and the father decided to place the child in foster care. . According to Jackson, the mother was concerned that she could not take care of the child properly while she was also parenting the two older children.
The child left the hospital in late July 2011 and was immediately placed with the foster mother. The child, who was 19 months old at the time of the entry of the termination judgment, has never resided with the parents.
The child is characterized as being medically fragile. The foster mother testified that the child’s colostomy bag must be changed every two to three hours and that his urethra must be cleaned carefully. She stated she had been warned that a failure to do either on a timely basis could *584 result in damage to the child’s kidneys. The child eats only a spoonful or two of food at a feeding, so he must be fed many times throughout the day. The foster mother stated that, at the time of the termination hearing, the child’s doctors were still investigating the reason for his inability to eat properly. In addition, the child takes nonprescription Tylenol or Motrin every four hours to address pain that doctors believe is caused by his un-fused pelvis. The child’s pelvis cannot be surgically corrected for some time, however. The foster mother stated that doctors first need to complete a series of three surgeries to create an anus for the child and to connect his intestines to his anus. The first of those surgeries was scheduled for the month after the termination hearing.
The foster mother explained that, after the intestinal surgeries, the child’s doctors would perform surgery to correct the placement of the child’s urethra; she was unsure how many surgeries that would entail. According to the foster mother, as the child grows, and particularly during puberty, he will have to have multiple additional surgeries on his anus, intestines, and urethra to adjust for his growth. Thus, the child’s extensive medical needs will continue through much of his life.
The child sees 10 different doctors on a regular basis. The foster mother testified that the child has between four and eight doctor’s appointments each month. The child’s pediatrician and his cardiologist are located in Huntsville, near the homes of the foster mother and the father, but the child’s other doctors and his physical, speech, and occupational therapists are located in Birmingham. The foster mother testified that it is important for the child to attend each medical appointment because he is medically fragile. Another reason cited by the foster mother for the importance of the child’s attending each scheduled medical appointment is that the child is on Medicaid, and the hospitals and therapists do not have to provide the child treatment; those providers could dismiss the child from treatment if he did not attend the appointments as scheduled.
The foster mother testified that she receives from DHR a total of approximately $1,000 per month in stipends for the care of the child.[2] She stated, however, that each month she spends $400 to $600 more than the stipend amount on the child’s medical supplies. The foster mother also admitted that she is often “overwhelmed” by the level of care the child needs. She stated that she has been able to manage the child’s care because her husband and her two oldest children, who are in college, help her care for her 14-year-old child and her 6-year-old child and do some of the household chores for her. The foster mother stated that she also has the support of her sister, who steps in to assist the other family members if a need arises and the foster mother is unable to address those needs because she must take care of the child.
Jackson testified that DHR initially offered the parents reunification services such as psychological evaluations, weekly visitation with the child, and in-home parenting training to prepare the parents for the child’s return to their custody. Jackson testified that she wanted to schedule that in-home training for both parents but that the parents informed her that the father worked a lot and that there was no way to schedule the training around his schedule. Therefore, Jackson stated, the in-home services were provided to the *585 mother from August 2011 through November 2011, when the mother requested that DHR stop providing those services.
After a November 6, 2011, visit with the child, the parents notified Jackson that they were considering voluntarily relinquishing custody of the child. Jackson testified that, when she took the child for a visit with the parents in their home on November 20, 2011, the parents declined to visit and sent Jackson and the child away. In February 2012, the mother and the father executed documents in which they voluntarily relinquished their parental rights to the child. The father testified at the termination hearing that he executed that document because the mother threatened to leave him and the other two children if he did not sign the document.
In early March 2012, the mother separated from the father and left the two older children in his care. The father testified that he has not heard from the mother since she left, and he was unsure whether they were divorced at the time of the termination hearing. The mother did not appear at the termination hearing.
The father testified that being a single parent made finding employment and child care difficult, and his income had decreased. At the time of the termination hearing, the father was renting a room in the apartment of a friend; he shared that room with the two children in his custody. The parents’ car had been paid for by the mother’s mother, who appears to have reclaimed the vehicle after the mother left the family. The father testified that he had a vehicle that he had recently repaired and that the vehicle was operational at the time of the termination hearing.
After the mother left the father and the father announced his desire to set aside his voluntary relinquishment of his parental rights to the child, DHR conducted a May 2012 Individualized Service Plan (“ISP”) meeting to establish reunification goals for the father.. Those goals of the ISP provided that the father obtain and maintain employment that would allow him to support the child, that the father attend the majority of the child’s medical appointments to familiarize himself with the child’s conditions and necessary care, and that the father contribute to the support of the child by providing diapers on a weekly basis. Also during the May 2012 ISP meeting, DHR added the father’s other two children to the ISP so that DHR could provide services for those children; those two children had not been part of DHR’s caseload before May 2012. DHR paid for day care for each of the children so that the father could work.
Jackson testified that both of the children in the father’s custody have special needs. She explained that the father’s oldest child had developmental delays such that he qualified for the Early Intervention program. After the child turned three years of age, he was no longer eligible for Early Intervention and should have transferred to a program administered by the school system. However, the father failed to schedule an appointment for the oldest child to be evaluated for eligibility into the school system’s program. Therefore, the father’s oldest child failed to receive any services to address his educational or therapeutic needs for more than six months before the termination hearing. Jackson stated that she had reminded the father several times to schedule the evaluation appointment so that services could resume for that child, but the father never made the appointment. Jackson stated that when the father met with her during a November 2012 ISP meeting, she made the appointment while he was in her office; that appointment was scheduled for February 2018 and had not taken place at the time of the termination hear *586 ing. Jackson testified that the younger child in the father’s custody received services from Early Intervention at his school.
The father works as a day laborer. The father stated that he has searched for more stable employment, but he had not located or secured such employment at the time of the termination hearing. It is undisputed that between early May 2012 and late December 2012 the father provided diapers in compliance with the May 2012 ISP goals only two times. The foster mother stated that on those two occasions the father provided only enough diapers to last for four days. The father provided no other support for the child other than providing some clothes for the child shortly after the child’s birth.
During the 19 months that the child had been in foster care, the father had attended only two of the child’s medical appointments, one of which was for an exploratory surgery; both of those appointments occurred before the mother left the father. Jackson testified that, after the May 2012 ISP meeting, she notified the father of a total of 11 doctor’s appointments scheduled between August 2012.and October 2012. Many of those appointments were for doctors located in Birmingham, but a few were for doctors in Huntsville. The father failed to attend any of those appointments, including one in which doctors hoped to obtain a DNA sample from the father that would assist them in better understanding the child’s genetic disorder. Jackson also stated that, in addition to those 11 appointments, the child also had other doctor’s appointments during that time. However, Jackson explained that those appointments were not listed as ones the father had failed to attend because they were arranged on such short notice that Jackson was unable to notify the father in advance of those appointments.
The father testified that he had lacked the money to attend the doctor’s appointments and that, on at least one occasion, he lacked transportation to attend an appointment. At the termination hearing, the father testified that the members of his church would help him transport the child to any doctor’s appointments and contribute financially to his support. The father presented the testimony of Rosa Maria Toussant, who works as an advocate at a children’s advocacy center; Toussant met the father by chance and was not a service provider identified for the father by DHR. Toussant testified that the father attended her church and that she and other church members were available to assist him with caring for his family, including the child. Toussant admitted that the father had not explained to her the exact nature of the child’s medical needs.
The father testified that he wanted custody of the child and that he would do the best he could to provide appropriate care for the child. When asked about his plans to care for the child while he worked (the child’s doctors have said the child cannot attend day care), the father testified that Toussant would hire two nurses to care for the child. However, the father admitted that he did know who would pay for those nurses. When asked whether he would have the financial resources to travel to the doctors’ appointments and pay for the child’s medical supplies, the father responded that his church members would assist him financially. We note that, shortly before the termination hearing, the father began receiving Social Security disability benefits for the oldest child and was appealing the denial of those benefits for the younger child in his custody. The father stated that he would also receive disability benefits for the child, which would help in providing for the child. The record indicates that the child receives ap *587 proximately $700 per month in disability benefits.[3]
The father also stated that he expected his mother to immigrate to the United States to assist him in caring for the children. The father explained that his mother had applied for a six-month visa and planned to immigrate to the United States soon. However, it is undisputed that, at the time of the child’s birth, the father’s mother had not yet received a visa allowing her entry into the United States. Jackson stated that the father had informed her at the time of the child’s birth, and since then, that he soon expected his mother to arrive in the United States.
The father also testified that he would take the child to all necessary doctor’s appointments. Jackson expressed concern that, based on the father’s failure to attend the child’s doctor’s appointments during the time the child has been in foster care, and especially after the May 2012 ISP meeting, the father would not take the child to all of his necessary appointments. Jackson also pointed out that the father had failed, after repeated reminders, to schedule an evaluation so that the oldest child could receive educational and therapeutic services after that child was no longer eligible for Early Intervention’s services.
Jackson also stated that she had reminded the father to apply for public housing but that he had not done so. However, the father testified that, shortly before the termination hearing, the older children’s pediatrician had completed and turned in the application for public housing for him and the children.
The father has regularly visited the child since his birth. The foster mother stated that the father has bonded well with the child. She stated that, with instruction and supervision, the father could change the child’s colostomy bag, but she expressed concern whether he could independently perform the necessary tasks for the child’s care. The father disputed that testimony and insisted he could learn to care for the child’s medical needs. On cross-examination, the father’s attorney obtained testimony from the foster mother and Jackson that the father could be trained to take care of the child’s multiple medical needs. Jackson pointed out, however, that the child needs virtually constant care and that the father needs full-time employment and has two other young, special-needs children.
The father submitted into evidence a total of five exhibits. Although the father designated the entire record for inclusion in the record on appeal, the father’s exhibits were omitted from the record. After requests from the clerk of this court, on July 15, 2013, the parties submitted to this court a “joint stipulation of trial exhibits” that included, in addition to DHR’s exhibits already contained in the record, two of the five exhibits submitted by the father to the juvenile court and admitted into evidence. The father’s exhibit one was a December 12, 2012, letter from the pediatrician for the two children in the father’s custody stating that those children had not missed any scheduled appointments with the pediatrician since June 1, 2012. The father’s second exhibit was an unsworn letter from a day-care worker, signed by “Ms. Kathy, Director,” stating that the children in the father’s custody appeared well cared for and that the father takes good care of those children. The parties stipulated that the other three omitted exhibits are letters from other day-care *588 workers that are the same, in substance, as the letter submitted to this court.
In its judgment terminating the parents’ parental rights, the juvenile court determined that the parents were unwilling or unable to meet the child’s needs and that that condition was not likely to change in the foreseeable future. The juvenile court noted that the father had repeatedly failed to attend doctor’s appointments and that missed appointments could be fatal for the child. The juvenile court also determined that the father lacked the financial resources and family support to assist him in properly caring for the child, and it concluded that the termination of parental rights was in the child’s best interests.
When a nonparent, such as DHR, petitions to terminate the parental rights of a parent, a juvenile court must apply a two-pronged test to determine whether to terminate parental rights:
“A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights.”
B.M. v. State, 895 So.2d 319, 331 (Ala.Civ.App.2004) (citing Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990)). The statutory grounds for terminating a parent’s parental rights are found at § 12-15-319, Ala.Code 1975.
On appeal, the father asserts, as part of his argument that the child is not dependent, that the juvenile court failed to consider his success in raising his other two children, that he maintained regular visits with the child, and that he had attempted, by providing diapers on two occasions, to provide for the child’s material needs. The father is correct that the juvenile court did not explicitly mention those facts in its judgment. However, the failure to mention those considerations does not equate with a conclusion that the juvenile court did not consider them. In fact, DHR does not dispute those facts, and the juvenile court also appears to have acknowledged them. However, as the juvenile court noted, the pertinent inquiry in this case is whether the father can meet the child’s nearly constant medical needs in addition to working and caring for the other two special-needs children in his custody.
With regard to that inquiry, the father argues that DHR did not make sufficient efforts toward reunifying him with the child. The father contends that DHR did not attempt to train him to care for the child. However, after the child’s birth, DHR provided in-home training for the parents. The father’s work schedule prevented the father from taking advantage of those services. At the May 2012 ISP meeting, the father agreed to attend the child’s medical appointments in order to familiarize himself with the child’s health conditions and to learn to properly address those conditions. The father failed to attend any of those appointments. The father also delayed making appointments for services for the two children in his custody, thus indicating that he might not be willing to make, or be capable of making, appropriate arrangements for medical treatment for the child if the child were placed in the father’s custody.
The juvenile court determined that the child was dependent. The evidence indicates that the child has severe medical issues that the father either cannot or will not address, and, therefore, the evidence supports the dependency determination. The juvenile court also determined that the father could not properly *589 support or provide care for the child and that that situation was not likely to change in the foreseeable future. At the time of the termination hearing, the father was sharing a room in a friend’s apartment with the two children in his custody. The father was working as a day laborer, and he stated that he would be dependent on church members to meet the financial burdens incurred by having the child in his home. We conclude that the evidence in the record on appeal supports the juvenile court’s determinations and that the juvenile court did not err in determining that grounds existed warranting the termination of the father’s parental rights. See T.L.S. v. Lauderdale Cnty. Dep’t of Human Res., 119 So.3d 431, 437 (Ala.Civ.App.2013) (rejecting the mother’s argument that placement with the father was a viable alternative to the termination of parental rights and stating that “[i]t is clear from the father’s testimony that, despite his and his wife’s best efforts, the father could not meet the special needs of the children in a safe environment and that the juvenile court had sufficient grounds to terminate his parental rights”).
With regard to whether there exists a viable alternative to the termination of his parental rights, the father contends that the child should have been placed in his custody or that the child could have been left in foster care.
The facts of this case are tragic. It is clear that the father loves the child and wants to parent him. However, it is equally clear that the child has complicated medical issues that require nearly constant attention. The foster mother testified that she has an extensive support system and that she still becomes overwhelmed by the child’s needs on occasion. The father stated that he has the support of Rosa and his church members, but none of those people testified on the father’s behalf that they would support the father financially or meet other needs of the family for any specific length of time. The juvenile court could reasonably have concluded that dependence on others for financial and logistical support was not a viable plan under which custody of the child might be placed •with the father. The father has two other special-needs children he is rearing by himself, and the evidence indicates that he has allowed the family’s food stamps to lapse on one occasion and has failed to schedule appointments for educational assistance for one of those older children. The evidence in the record indicates that, although the father is willing to attempt to provide appropriate care for the child, he is unable to do so in his current situation.
As is indicated above, the evidence supports a determination that the father could not provide appropriate care and financial support for the child. Placement with the father is not a viable alternative to the termination of the father’s parental rights.
The father cites M.E. v. Shelby County Department of Human Resources, 972 So.2d 89, 103 (Ala.Civ.App.2007), for the proposition that “[pjlacement with third parties, such as ... foster parents ..., may be a reasonable and less drastic alternative to termination of parental rights.” However, M.E. was a plurality opinion and does not constitute binding precedent. Further, the opinion in M.E. acknowledged contrary authority standing for the proposition that leaving a child in foster care indefinitely is not a viable alternative to termination, especially when the parent has not attempted to adjust his or her circumstances or has failed to address the issues that caused DHR to seek the termination of parental rights.[4] See *590 R.L.B. v. Morgan Cnty. Dep’t of Human Res., 805 So.2d 721, 725 (Ala.Civ.App.2001) (“Retaining the child in foster care is not a ‘viable alternative’ to termination.”); see also G.P. v. Houston Cnty. Dep’t of Human Res., 42 So.3d 112, 120 (Ala.Civ.App.2009) (rejecting continued, indefinite placement in foster care as a viable alternative to termination when “the child would be forced to remain in foster care awaiting the mere possibility that the circumstances would permit the father to take custody of the child at some point in the future”).
In this case, the juvenile court properly considered and rejected the proposed alternatives to termination, and it found that termination was in the child’s best interests. The father contends in his brief on appeal that the termination of his parental rights is not in the child’s best interests. Other than a discussion of case-law, the father’s argument on this issue is limited to a statement that DHR did not meet its burden of proving unfitness, as is required by Ex parte Terry, 494 So.2d 628 (Ala.1986). However, the custody standard set forth in Ex parte Terry is not applicable in a termination-of-parental-rights case. W.T.H. v. M.M.M., 915 So.2d 64, 70 (Ala.Civ.App.2005); M.S. v. State Dep’t of Human Res., 648 So.2d 584, 586 (Ala.Civ.App.1994).
We are not unsympathetic to the father’s situation and his desire to parent the child. However, the record clearly demonstrates that the father is unable to financially support the child and that he is unable to provide the level of care required by the child’s intensive medical needs. The child’s foster parents are providing the almost around-the-clock care the child needs, and they wish to adopt the child. We conclude that the juvenile court’s determination that the termination of parental rights is in the best interests of the child is supported by the record on appeal. The father has failed to demonstrate error on appeal.
AFFIRMED.
PITTMAN, THOMAS, and DONALDSON, JJ., concur.
MOORE, J., dissents, with writing.

. The mother is not a party to this appeal.

. DHR pays the foster parents a $432-per-month stipend for the care of a foster child, and it pays them an additional $600 per month because the child is medically fragile.

. DHR, which is the child's legal custodian, receives the $700 in federal benefits. DHR pays the foster parents approximately $1,000 per month in foster-care stipends.

. The father cites Ex parte T.V., 971 So.2d 1, 8 (Ala.2007), for the general proposition that a *590 party must prove by clear and convincing evidence that there are no viable alternatives to termination. The father does not argue that the facts of Ex parte T.V. are similar to those of this case. In that case, the child's foster mother sought to terminate the parental rights of the child’s mother, and the juvenile court granted the petition. Our supreme court reversed, noting that the evidence indicated that the mother "has stopped using drugs, that she has reconciled with her family, that she participates in raising and supporting her other son, and that she regularly attends church.’’ Ex parte T.V., 971 So.2d at 10. The facts of this case indicate that, unlike the mother in Ex parte T.V., the father has not made progress in the areas that have caused DHR to seek the termination of his parental rights. Although the father in this case is successfully rearing his other children, he has not attended the child's medical appointments or demonstrated that he has the time or financial ability to meet the child's special needs. Accordingly, we conclude that Ex parte T.V. is distinguishable from the facts of this case.