Rel: January 31, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2023-2024

_____

### CL-2022-1246, CL-2022-1247, CL-2022-1248, CL-2022-1249 and CL-2022-1250

_____

## C.S.

### v.

## Morgan County Department of Human Resources, J.R., and A.R.

### Appeals from Morgan Juvenile Court
(JU-21-12.01, JU-21-12.02, JU-21-12.03, JU-21-12.04, and JU-21-12.05)

_____

### CL-2022-1277, CL-2022-1279, and CL-2022-1280

_____

## J.R. and A.R.

### v.
## Morgan County Department of Human Resources, C.S., and J.B.

CL-2022-1246, CL-2022-1247, CL-2022-1248, CL-2022-1249, CL-2022-1250, CL-2022-1277, CL-2022-1279, CL-2022-1280, CL-2022-1288, and CL-2022-1289

**Appeals from Morgan Juvenile Court
(JU-21-12.01, JU-21-12.04, and JU-21-12.05)**

_____

**CL-2022-1288 and CL-2022-1289**
_____

**J.B.**

v.

**Morgan County Department of Human Resources,
J.R., and A.R.**

**Appeals from Morgan Juvenile Court
(JU-21-12.01 and JU-21-12.03)**

MOORE, Judge.

On November 29, 2022, the Morgan Juvenile Court ("the juvenile court") entered in the five related actions below separate, but identical, judgments determining that A.J.S. ("the child") was dependent, awarding custody of the child to J.R. and A.R. ("the foster parents"), awarding C.S. ("the mother") supervised visitation with the child, awarding J.B. ("the father") graduated visitation, subject to suspension if he allowed the mother unapproved contact with the child, denying the foster parents' petitions to terminate the parental rights of the mother and of the father

CL-2022-1246, CL-2022-1247, CL-2022-1248, CL-2022-1249, CL-2022-1250, CL-2022-1277, CL-2022-1279, CL-2022-1280, CL-2022-1288, and CL-2022-1289

and to adopt the child, and relieving the Morgan County Department of Human Resources ("DHR") from any further supervisory responsibilities toward the child. The mother and the father appealed, and the foster parents cross-appealed. This court consolidated the appeals and cross-appeals ex mero motu.

Background

In 2019, the mother and the father, who had been childhood friends, became reacquainted and entered into a brief romantic relationship. Approximately two weeks after the relationship ended, the mother informed the father that she was pregnant. The father responded that he would assume responsibility for the child, but the mother told the father that she believed that H.R., who she described as her longtime boyfriend, had fathered the child. The child was born out-of-wedlock on June 30, 2020. Not long after the birth of the child, the mother informed the father that H.R. was, indeed, the biological father of the child. Based on that communication, the father believed that the paternity of the child had been conclusively established and that he had no familial relationship with the child.

3

CL-2022-1246, CL-2022-1247, CL-2022-1248, CL-2022-1249, CL-2022-1250, CL-2022-1277, CL-2022-1279, CL-2022-1280, CL-2022-1288, and CL-2022-1289

The mother assumed sole custody of the child. On October 20, 2020, DHR participated in a welfare check on the child. Based on concerns that the mother was suffering from a mental illness and that she was abusing controlled substances, DHR instituted a safety plan, pursuant to which custody of the child was transferred to the child's maternal grandmother, who was required to supervise any contact between the mother and the child. In January 2021, as the end of the 90-day term of the safety plan was approaching, the mother indicated to DHR that she was going to resume custody of the child. In response, DHR commenced a dependency action (case number JU-21-12.01), obtained custody of the child, and placed the child into foster care.

DHR originally adopted a permanency plan to rehabilitate the mother and to reunite the child with her biological family. In February 2021, H.R. submitted to genetic testing, which conclusively proved that he was not the biological father of the child. The mother did not provide DHR with sufficient information to enable DHR to ascertain the identity of the biological father of the child. The mother also did not cooperate with the reasonable efforts of DHR to address her mental-health and

4

substance-abuse issues. On May 17, 2021, the juvenile court entered a judgment finding the child dependent and awarding the mother only supervised visitation with the child. The mother appealed that judgment, and this court affirmed the judgment. See C.S. v. Morgan Cnty. Dep't of Hum. Res. (No. 2200662, Dec. 2, 2021), 368 So. 3d 863 (Ala. Civ. App. 2021) (table). While that appeal was pending, DHR indicated that it intended to change the permanency plan to termination of the parental rights of the mother with adoption by the foster parents. The mother responded by commencing an action (case number JU-21-12.02) to regain custody of the child or to allow her unsupervised visitation with the child.

On January 5, 2022, after genetic testing had established the father's paternity of the child, the juvenile court allowed the father to intervene in the dependency action (case number JU-21-12.01), and the father filed a petition seeking custody of the child. The foster parents subsequently intervened in the dependency action (case number JU-21-12.01), and, on April 27, 2022, they commenced their own independent custody action (case number JU-21-12.03), along with an action to

CL-2022-1246, CL-2022-1247, CL-2022-1248, CL-2022-1249, CL-2022-1250, CL-2022-1277, CL-2022-1279, CL-2022-1280, CL-2022-1288, and CL-2022-1289

terminate the parental rights of the mother and of the father (case number JU-21-12.04). At approximately the same time, the foster parents filed a petition to adopt the child in the Morgan Probate Court, which transferred the adoption action to the juvenile court, commencing a fifth action (case number JU-21-12.05). The juvenile court consolidated all five actions for trial purposes, conducted a trial over the course of several days, and, on November 29, 2022, entered the judgments at issue in these appeals.

Dismissals

We dismiss appeal number CL-2022-1248 and appeal number CL-2022-1289, both of which arise from the judgment entered in case number JU-21-12.03. The record shows that, on April 27, 2022, the foster parents filed a "verified petition for custody" in which they sought custody of the child should the child be adjudicated dependent; that petition was, in substance, a complaint in intervention in case number JU-21-12.01. See Rule 24(c), Ala. R. Civ. P. The juvenile-court clerk erroneously treated the petition for custody as an independent dependency petition and assigned the petition a new case number -- JU-21-12.03 -- but the petition

CL-2022-1246, CL-2022-1247, CL-2022-1248, CL-2022-1249, CL-2022-1250, CL-2022-1277, CL-2022-1279, CL-2022-1280, CL-2022-1288, and CL-2022-1289

did not allege any specific facts relating to the dependency of the child, see Ala. Code 1975, § 12-15-121(c)(1), and it, therefore, did not invoke the dependency jurisdiction of the juvenile court. See G.W.K. v. B.W.M., [Ms. CL-2022-0911, July 14, 2023] ___ So. 3d ___ (Ala. Civ. App. 2023). The judgment entered in case number JU-21-12.03 is therefore a void judgment and will not support an appeal. Id.

We also dismiss appeal numbers CL-2022-1249 and CL-2022-1250, arising from the judgments entered in case numbers JU-21-12.04 and JU-21-12.05, respectively. The judgments entered in those cases denied the foster parents' petitions to terminate the mother's parental rights and to adopt the child. The mother did not suffer any adverse ruling in those cases that would sustain an appeal. In the absence of an adverse ruling, an appeal must be dismissed. Ex parte D.M., 370 So. 3d 551, 557 (Ala. Civ. App. 2022); Smith v. Renter's Realty, 296 So. 3d 844, 850 (Ala. Civ. App. 2019).

Finally, we dismiss appeal number CL-2022-1277, arising from the judgment entered in case number JU-21-12.01. The judgment entered in that case found the child dependent and awarded custody of the child to

7

CL-2022-1246, CL-2022-1247, CL-2022-1248, CL-2022-1249, CL-2022-1250, CL-2022-1277, CL-2022-1279, CL-2022-1280, CL-2022-1288, and CL-2022-1289

the foster parents, subject to the visitation rights of the mother and the father. The foster parents have not pointed this court to any adverse ruling supporting their appeal, see Rule 28(a)(5), Ala. R. App. P., and they make no argument for reversal of the judgment. See Rule 28(a)(10), Ala. R. App. P. We therefore conclude that the foster parents have abandoned that appeal. See Rule 2(a)(2)(C), Ala. R. App. P.

Issues

In the remaining appeals, the father argues that the juvenile court erred in finding the child dependent, in denying his petition for custody of the child, and in providing that his visitation with the child would be suspended if he allowed the mother unapproved contact with the child. The mother argues that the juvenile court erred in finding the child dependent, in denying her claim for custody of the child, and in denying her claim for unsupervised visitation with the child. [1] The foster parents

---

[1]The mother also argues that the juvenile court erred in allowing the foster parents to intervene in case number JU-21-12.01; however, the mother did not raise any objection to the foster parents' intervention to the juvenile court, so that issue has not been preserved for appellate review. See Andrews v. Merritt Oil Co., 612 So. 2d 409, 410 (Ala.1992).

8

CL-2022-1246, CL-2022-1247, CL-2022-1248, CL-2022-1249, CL-2022-1250, CL-2022-1277, CL-2022-1279, CL-2022-1280, CL-2022-1288, and CL-2022-1289

argue that the juvenile court erred in denying their petition to terminate the parental rights of the mother and of the father and their petition to adopt the child.

## Dependency

We first address the dependency determination. In the final judgments, the juvenile court found that the child was dependent "as to the father and remains so as to the mother." The mother argues that the juvenile court did not receive sufficient evidence to support that determination. The father makes a similar argument; he asserts that the juvenile court erred in finding that the child was dependent "as to the father" because none of the statutory grounds for dependency were established by any evidence, much less the requisite clear and convincing evidence.

The Alabama Juvenile Justice Act ("the AJJA"), Ala. Code 1975, § 12-15-101 et seq., defines a "dependent child," as

> "[a] child who has been adjudicated dependent by a juvenile court and is in need of care or supervision and meets any of the following circumstances:

9

"1. Whose parent, legal guardian, legal custodian, or other custodian subjects the child or any other child in the household to abuse, as defined in [§] 12-15-301[, Ala. Code 1975,] or neglect as defined in [§] 12-15-301, or allows the child to be so subjected.

"2. Who is without a parent, legal guardian, or legal custodian willing and able to provide for the care, support, or education of the child.

"3. Whose parent, legal guardian, legal custodian, or other custodian neglects or refuses, when able to do so or when the service is offered without charge, to provide or allow medical, surgical, or other care necessary for the health or well-being of the child.

"4. Whose parent, legal guardian, legal custodian, or other custodian fails, refuses, or neglects to send the child to school in accordance with the terms of the compulsory school attendance laws of this state.

"5. Whose parent, legal guardian, legal custodian, or other custodian has abandoned the child, as defined in subdivision (1) of [§] 12-15-301.

"6. Whose parent, legal guardian, legal custodian, or other custodian is unable or unwilling to discharge his or her responsibilities to and for the child.

"7. Who has been placed for care or adoption in violation of the law.

"8. Who, for any other cause, is in need of the care and protection of the state."

§ 12-15-102(8)a., Ala. Code 1975.

Section 12-15-310(b), Ala. Code 1975, provides that a juvenile court shall dismiss a dependency petition if the petitioner fails to prove the dependency of the child by clear and convincing evidence. "Clear and convincing evidence" means "[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion." Ala. Code 1975, § 6-11-20(b)(4) (cited in numerous dependency cases).

> "Although the juvenile court's factual findings in a dependency case when the evidence has been presented ore tenus are presumed correct, T.D.P. v. D.D.P., 950 So. 2d 311 (Ala. Civ. App. 2006), a finding of dependency must be supported by clear and convincing evidence. Ala. Code 1975, § 12-15-310(b). When reviewing a dependency judgment on appeal, '[t]his court does not reweigh the evidence but, rather, determines whether the findings of fact made by the juvenile court are supported by evidence that the juvenile court could have found to be clear and convincing.' K.S.B. v. M.C.B., 219 So. 3d 650, 653 (Ala. Civ. App. 2016). That is, this court '"must ... look through ['the prism of the substantive evidentiary burden,' Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986),] to determine whether

> there was substantial evidence before the trial court to support a factual finding, based upon the trial court's weighing of the evidence, that would 'produce in the mind [of the trial court] a firm conviction as to each element of the claim and a high probability as to the correctness of the conclusion.'"' K.S.B., 219 So. 3d at 653 (quoting Ex parte McInish, 47 So. 3d 767, 778 (Ala. 2008), quoting in turn Ala. Code 1975, § 25-5-81(c))."

H.A.S. v. S.F., 298 So. 3d 1092, 1097-98 (Ala. Civ. App. 2019).

In its findings of fact, the juvenile court determined that the mother has "mental health issues, pending criminal issues and financial and housing issues" and expressed "great, deep concern for the mother's ability to parent the child due to the evidence presented, the observation of the court of the mother and the overall actions of the mother regarding the child." The juvenile court recognized that the mother loves the child, but the juvenile court believed that her love was "not enough to guarantee the safety of the child while with the mother."

The determination of whether a child remains dependent must be based on current circumstances. S.S. v. R.D., 258 So. 3d 340, 345 (Ala. Civ. App. 2018). The mother basically argues that the juvenile court should have determined that she was able to properly care for the child

12

by the time of the final hearings in September 2022 because, according to the mother, she had resolved many of the problems that had led to the removal of the child from her custody. A March 2022 psychological evaluation commissioned by DHR determined that "[the mother] does not share personal and interpersonal characteristics of known child abusers and, as such, is considered to be unlikely to physically abuse a child in the future." In March 2022, the mother started a mental-health program as ordered by the Madison District Court as a condition to avoid conviction on criminal charges pending in that court. As part of that program, the mother began residing in an apartment in Huntsville that is owned by the mental-health provider overseeing her rehabilitation. By the time of the final hearings, the mother had secured stable employment, and she produced a series of negative drug screens. Stephanie Chasteen, the DHR social worker who had been overseeing the child's case since February 2022, testified that the mother had been following the recommendations of her mental-health counselors and that she had been doing better since she had started the mental-health program. Chasteen had experienced no problems with the mother during

the mother's visits with the child, which, Chasteen said, "for the most part" had been positive. The mother was enjoying unsupervised visitation with A.M., the child's eight-year-old half sister. N.M., A.M.'s father, testified that, in 2020, after the mother had exhibited serious mental-health problems associated with substance abuse, he had obtained a court order requiring that the mother's visits with A.M. be supervised. He said that, after April 2022, the mother had drastically improved, so he had allowed her to resume unsupervised visits, which, he said, had been going well.

However, as the juvenile court noted, at the time of the final hearings, the mother lacked the ability to provide the child with appropriate shelter. The mother testified that the apartment complex where she was undergoing her mental-health treatment did not allow children. The mother testified that she would not complete the program for another six months. Furthermore, the juvenile court could have reasonably determined that the mother's mental-health issues had not completely resolved. The juvenile court had previously determined that the child was dependent in part because of the mother's mental-health

14

issues, which had manifested in delusional thoughts, manic episodes, criminal misconduct, and threatening behavior that had frightened the child during visits. The juvenile court determined that the mother seemed to be progressing toward resolving her mental-health issues but noted that she was only halfway through her rehabilitation program. Hearing the mother's testimony minimizing her past behavior, including her concealment of the father's paternity, the juvenile court could have been reasonably convinced that the mother had not sufficiently recovered from her mental illness to resume proper custody of the child. It was within the province of the juvenile court to resolve the competing evidence to conclude that the child remained dependent as to the mother. See Montgomery Cnty. Dep't of Hum. Res. v. T.S., 218 So. 3d 1252, 1268 (Ala. Civ. App. 2016).

As the father correctly points out, in the dependency action, DHR and the foster parents (referred to collectively as "the petitioners") did not pursue any theory that the father had abused, neglected, or abandoned the child, see § 12-15-102(8)a.1. & 5., or that the child was dependent as to the father for any of the reasons set forth in § 12-15-

102(8)a.2., 3., 4., 7., or 8. The petitioners also did not attempt to prove that the father was generally unfit to parent the child. The evidence showed that the father, a 41-year-old union electrician, had coparented with his wife, from whom he was separated, to raise a 15-year-old son, who, by all accounts, was doing well and making good grades. The father resided in a three-bedroom home that was suitable for the child. The father has no criminal history, no substance-abuse problem, and no mental or physical disability. The father has a good family-support system within his nearby community, and numerous relatives and friends testified that the father was a good person and that he would be a good parent to the child. The father's visits with the child had gone well, and the child referred to the father as "Daddy." The foster parents attempted to prove that the father had committed domestic abuse against S.H. in 2011, but the Lauderdale County Department of Human Resources ("the Lauderdale County DHR") had investigated the father at that time and had determined that he was not a violent person and that "[i]nformation was not obtained that would warrant allegations [of abuse] being entered against [the father]." The petitioners did not

CL-2022-1246, CL-2022-1247, CL-2022-1248, CL-2022-1249, CL-2022-1250, CL-2022-1277, CL-2022-1279, CL-2022-1280, CL-2022-1288, and CL-2022-1289

present any evidence of a single act of domestic violence perpetrated by the father, and the juvenile court did not find that the father had committed domestic violence.

The evidence further shows that the father was more than willing to assume the care and custody of the child. When the mother told him of his probable paternity in late September 2021, the father responded that he wanted the child and that the mother should immediately inform DHR of his identity. When DHR contacted the father the next day, the father agreed to genetic testing. With the father's permission, the mother scheduled genetic testing to take place at a local laboratory, but DHR would not accept that laboratory. On October 13, 2021, DHR commenced a child-support action in the juvenile court and scheduled court-ordered genetic testing at an approved laboratory to take place in January 2022. The father retained an attorney and instructed the attorney to move the juvenile court to expedite the genetic testing with the hope that it would be completed in time for him to assume custody of the child before Christmas. As a result of his actions, the genetic testing was moved up

17

CL-2022-1246, CL-2022-1247, CL-2022-1248, CL-2022-1249, CL-2022-1250, CL-2022-1277, CL-2022-1279, CL-2022-1280, CL-2022-1288, and CL-2022-1289

to December 6, 2021, and the test results were delivered before the end of 2021.

On October 15, 2021, the father filed a motion to intervene in the ongoing dependency action (case number JU-21-12.01) for the purposes of asserting his paternity and a claim to the custody of the child. The juvenile court disallowed the intervention because it had lost jurisdiction over the dependency action while the May 17, 2021, judgment was on appeal, but the father persevered. On January 4, 2022, after the father obtained the results of the genetic testing proving that he was the biological father of the child, he again filed a motion to intervene in the dependency action. Because the juvenile court had regained jurisdiction of the dependency action by that time, the juvenile court granted the motion. The father met with DHR social workers to arrange for visitation with the child and to establish an individualized service plan ("ISP") to take steps toward gaining custody of the child. On January 18, 2022, the father admitted his paternity of the child at a permanency hearing, and the juvenile court adjudicated him to be the father of the child. On January 31, 2022, the father submitted an agreement in the child-

18

CL-2022-1246, CL-2022-1247, CL-2022-1248, CL-2022-1249, CL-2022-1250, CL-2022-1277, CL-2022-1279, CL-2022-1280, CL-2022-1288, and CL-2022-1289

support action, pursuant to which he agreed to pay $640 per month in child support, plus any arrearage; the father has faithfully paid every installment of child support when due.

On January 7, 2022, DHR conducted the first ISP meeting with the father. At that ISP meeting, the father agreed that he would maintain stable housing and employment, that he would provide DHR with a copy his pay stubs and documents relating to his ownership of his house, and that he would participate in random drug screens. The father followed through with each of those requirements. The father opened his house to DHR, which determined that it was suitable for the child. The father informed his parents of the prospect that the child might be coming to live with him and obtained their agreement to assist him with caring for the child. The father also consistently visited with the child in accordance with the schedule established by DHR and under the conditions imposed by DHR and its visitation supervisors. The father testified repeatedly before the juvenile court that he desired to have custody of the child and that he was willing to raise the child.

19

CL-2022-1246, CL-2022-1247, CL-2022-1248, CL-2022-1249, CL-2022-1250, CL-2022-1277, CL-2022-1279, CL-2022-1280, CL-2022-1288, and CL-2022-1289

The petitioners asserted that the child was dependent as to the father by relying solely on the theory that the father lacked "protective capacity." During the trial, none of the witnesses testified as to the meaning of "protective capacity,"[2] but they testified that they were "concerned" that the father would not protect the child from being harmed by the mother. The child's guardian ad litem and the court-appointed special advocate were particularly "concerned" that the father, who had been infatuated with the mother at least since they were in high school together, could potentially place his desire for a romantic relationship with the mother above the safety needs of the child. In

_____

[2]In a postjudgment motion, the father referred to Ala. Admin. Code (Dep't of Hum. Res.), r. 660-5-34-.14(4), which defines "protective capacities" as:

> "Parent/primary caregiver resources that can or do provide for child safety. These capacities include, but are not limited to, parenting/caregiving knowledge and skills; attachment to the children; awareness of and ability to interpret and meet children's needs; and a willingness and ability to act protectively when the children experience safety threats."

In context, the petitioners questioned whether the father was willing and able to act protectively when the child experienced safety threats from the mother.

CL-2022-1246, CL-2022-1247, CL-2022-1248, CL-2022-1249, CL-2022-1250, CL-2022-1277, CL-2022-1279, CL-2022-1280, CL-2022-1288, and CL-2022-1289

substance, the petitioners asserted that the father was "unable or unwilling to discharge his [duty to protect] the child." See Ala. Code 1975, § 12-15-102(8)a.6.; Ex parte M.D.C., 39 So. 3d 1117, 1121 (Ala. 2009) (recognizing the duty to protect as one of the parental "responsibilities" a parent owes a child). Based on comments the father made to the court-appointed special advocate for the child and his testimony, the juvenile court could have been clearly convinced that the father desired a romantic relationship with the mother and that he may be more forgiving of her faults because of his affection for her; however, the juvenile court did not receive clear and convincing evidence from which it could have inferred that his feelings for the mother had robbed him of his ability and willingness to protect the child.

In the November 29, 2022, judgments, the juvenile court determined that the father had "failed to move to protect the child" from the mother. The petitioners presented no evidence indicating that the father had ever actively neglected to protect the child from the mother. In 2020, when the mother was exercising sole custody of the child, the father, as the juvenile court determined, had believed that he was not the

21

CL-2022-1246, CL-2022-1247, CL-2022-1248, CL-2022-1249, CL-2022-1250, CL-2022-1277, CL-2022-1279, CL-2022-1280, CL-2022-1288, and CL-2022-1289

father of the child. The father did not interact with the mother and the child before DHR removed the child from the mother's home and placed the child into protective foster care. In 2021, after the father learned of his paternity, DHR had already instituted supervised visitation for the mother that, according to DHR's witnesses, had ameliorated any safety threats to the child. In 2022, when the father intervened in the case and filed his petition for custody of the child, he specifically requested that the juvenile court maintain supervised visitation for the mother. While his petition was pending, the father visited with the child separately from the mother. The father contacted the mother throughout 2022, but, as the juvenile court expressly determined, "the child was not present during the times of contact between the parents." The father never had an occasion to respond to any safety threat the mother posed to the child and, consequently, never failed to protect the child from the mother. At trial, the father testified that he was hopeful that the mother would eventually have unsupervised visitation with the child, but he acknowledged that any visitation between the child and the mother should continue to be supervised unless and until the mother proved that

CL-2022-1246, CL-2022-1247, CL-2022-1248, CL-2022-1249, CL-2022-1250, CL-2022-1277, CL-2022-1279, CL-2022-1280, CL-2022-1288, and CL-2022-1289

she was fit for unsupervised visitation. See, e.g., Cantrell v. Cantrell, 367 So. 3d 426, 451 (Ala. Civ. App. 2022) (holding that a restriction of supervised visitation may be lifted only upon proof of a change of material circumstances and proof that unsupervised visitation serves the best interests of the child).

The petitioners also presented no clear and convincing evidence indicating that the father lacked a natural protective instinct toward the child. It is well settled that Alabama law presumes that a parent possesses all the natural instincts needed to properly raise his or her child, which presumption may be overcome only by clear and convincing evidence to the contrary. See Griggs v. Barnes, 262 Ala. 357, 359, 78 So. 2d 910, 912 (1955) (holding that evidence of "a shabby and uncompelling nature" is insufficient to prove that a parent lacks the capacity to properly raise his or her child). The best evidence directly bearing on that point showed that the father possessed the natural qualities necessary to appropriately protect the child. From approximately 2011 to 2021, the father was in a romantic relationship with S.H. Near the beginning of their relationship, the Lauderdale County DHR had opened

23

an investigation of S.H. to determine whether S.H. had abused or neglected her minor daughter while S.H. was under the influence of controlled substances. During that investigation, the Lauderdale County DHR was asked to consider placing S.H.'s daughter with the father as part of a safety plan. The father underwent a parenting assessment to determine whether he would be an appropriate person to act as a custodian for S.H.'s daughter, who was approximately 10 years old at the time. Based on that assessment, the counselor retained by the Lauderdale County DHR determined that the father "was very natural with his parenting answers," and the counselor informed the Lauderdale County DHR "that she ha[d] no concerns regarding [the father's] being a safety plan for [S.H.'s daughter]." The Lauderdale County DHR subsequently placed S.H.'s daughter in the care of the father, who exercised his protective capacity on several occasions by denying S.H. access to her daughter when he deemed it necessary for the safety and welfare of her daughter. The father testified that the safety plan ended only after S.H. recovered from her substance-abuse problem.

CL-2022-1246, CL-2022-1247, CL-2022-1248, CL-2022-1249, CL-2022-1250, CL-2022-1277, CL-2022-1279, CL-2022-1280, CL-2022-1288, and CL-2022-1289

The juvenile court did not receive into evidence any updated parenting assessment showing that the father had since lost the protective capacity he had displayed in 2011 or that his protective instincts would not be as strong toward his own child. The petitioners theorized that the father would not appropriately protect the child because of his desire for a romantic relationship with the mother; however, the Lauderdale County DHR records showed that, in 2011, the father was willing to place the safety needs of S.H.'s daughter above his interest in maintaining his relationship with S.H. The child's guardian ad litem complained that the father did not have a complete understanding of the mother's condition and misbehavior, but the petitioners did not present any evidence indicating that the father needed such detailed knowledge to discharge the basic responsibility to protect the child. Nothing in the record indicates that the father cannot detect a safety threat and appropriately respond to that threat because he cannot diagnose the reason for the mother's misbehavior. The father testified that he understood that the mother's visitation needed to be supervised because her behavior may threaten the safety of child, and he testified

25

further that he would take any steps a "normal father" would take to protect the child.

In reaching its determination that the father lacked protective capacity, the juvenile court relied almost exclusively on the evidence indicating that the father had maintained a relationship with the mother over the objections of DHR. In January 2022, when the father intervened in the dependency action, DHR instructed the father not to maintain any contact with the mother "even about the weather." The father testified that he had understood that DHR wanted him to protect the child from the mother, but, he said, after conferring with his attorney, he had concluded that it would be safe to contact the mother about the child. When DHR discovered that the mother had been to the father's house and that the father had sent the mother photographs of his visits with the child, DHR warned the father that it considered those contacts detrimental to his custody claim, and it curtailed its efforts to unite the child with the father. The father, however, still associated with the mother. Between April and September 2022, the father routinely talked to the mother, and he allowed the mother to regularly visit his home with

26

CL-2022-1246, CL-2022-1247, CL-2022-1248, CL-2022-1249, CL-2022-1250, CL-2022-1277, CL-2022-1279, CL-2022-1280, CL-2022-1288, and CL-2022-1289

A.M., the child's half sibling. The father did not disclose those contacts to DHR, the child's guardian ad litem, or the court-appointed special advocate for the child. The petitioners did not present clear and convincing evidence indicating that the father had resumed a romantic relationship with the mother or that she had moved in with him, but the petitioners did prove that the father intended to maintain a relationship with the mother that may progress in that direction. In the final judgments, after noting that the father had "issues setting boundaries with the mother," the juvenile court concluded that the father had "forfeited any real opportunity to have a steady and solid relationship when he failed to exercise protective capacity for the child regarding the mother." We disagree.

In In re Adoption of Soledad, 79 Mass. App. Ct. 1107, 944 N.E.2d 632 (2011) (table) (unpublished opinion), a Massachusetts juvenile court terminated the rights of the parents of "Soledad," a child with two siblings. Soledad's father had an extensive criminal history, including having committed several violent crimes and drug offenses. The Massachusetts Department of Children and Families took Soledad and

CL-2022-1246, CL-2022-1247, CL-2022-1248, CL-2022-1249, CL-2022-1250, CL-2022-1277, CL-2022-1279, CL-2022-1280, CL-2022-1288, and CL-2022-1289

her two siblings into custody and formulated a service plan that called for, among other things, Soledad's mother to discontinue interacting with Soledad's father. Soledad's mother substantially complied with the service plan; however, she maintained her relationship with Soledad's father, and she exhibited "a lack of candor" about that continuing relationship. Id. at n.6. The Massachusetts juvenile court considered that evidence sufficient to prove that Soledad's mother could not properly parent her children. On appeal, the Massachusetts Appeals Court reversed the judgment, stating, in pertinent part:

> "[D]uring the period in question, the children were never exposed to the father. Simply stated, the mother's contact with the father had no effect on the children because the mother herself was prevented from seeing them. Even were we to accept an automatic imputation of adverse effect on the children from contact with the father, we reject the department's argument that the parents' association with each other allows the inference that the mother would expose the children to their father in the event she were given the opportunity. We also reject the entirely circular argument that the mother neglected the children by inviting termination of her rights through contact with the father because she had been warned that the department considered such contact detrimental and grounds for termination.
>
> "To the extent the assertion that the mother failed to comply with her service plan is based on her contact with the

28

father, it merely restates the same complaint and adds nothing to the department's case for termination."

Id. (footnote omitted).

We find that reasoning persuasive. At trial, DHR conceded that the father had substantially complied with his ISP and that it would have recommended that the father be awarded custody except for his continuing contacts with the mother, which it deemed to jeopardize the safety of the child. The child's guardian ad litem found no fault with the father other than his failure to extricate himself from his relationship with the mother. Because the child was never present during any of the contacts between the father and the mother, the child was not endangered in any way by the relationship between the father and the mother, which, in fact, had no proven effect on the child. The mere fact that the father regularly associated with the mother does not permit an inference that, if given the opportunity, he would expose the child to the mother without proper supervision or allow the mother to interact with the child in a manner that would endanger the health and safety of the child. Indisputably, the father did not follow DHR's no-contact edict, and

29

the father did not heed DHR's warnings that it would oppose his custody claim if he did not disassociate from the mother; however, the father's "violation" of the no-contact directive, which, we note, was never incorporated into any juvenile-court order, does not in any way prove that the father lacks the ability or willingness to protect the child. Clearly, a parent does not "forfeit" his or her custodial rights simply by failing to comply with the terms of an ISP as requested by DHR. See, e.g., B.L. v. Elmore Cnty. Dep't of Hum. Res., 324 So. 3d 829 (Ala. Civ. App. 2020); H.B. v. Mobile Cnty. Dep't of Hum. Res., 236 So. 3d 875 (Ala. Civ. App. 2017); S.K. v. Madison Cnty. Dep't of Hum. Res., 990 So. 2d 887 (Ala. Civ. App. 2008).

We recognize that, in some circumstances, a juvenile court may find a child dependent or even terminate the parental rights of a parent who is unable or unwilling to protect his or her child from an abusive or neglectful coparent. See, e.g., B.M. v. State, 895 So. 2d 319 (Ala. Civ. App. 2004) (affirming judgment terminating parental rights of father who refused to believe mother had committed Munchausen's syndrome by proxy against their oldest child when expert testimony indicated his

lack of belief rendered father unable to protect child and his siblings); J.B.B. v. Alabama Dep't of Hum. Res., 120 So. 3d 517, 531 (Ala. Civ. App. 2013) (affirming judgment terminating parental rights of parent who refused to believe that other parent had sexually abused children due to lack of protective capacity); B.N.D. v. Barbour Cnty. Dep't of Hum. Res., 370 So. 3d 271 (Ala. Civ. App. 2022) (recognizing that a child may be adjudicated dependent if a parent is aware of the abusive behavior of another parent but fails to prevent that abusive behavior from occurring); C.W. v. State Dep't of Human Res., 826 So. 2d 171, 173-74 (Ala. Civ. App. 2002) (determining that the children in question were dependent after considering the mother's refusal to sever her relationship with an abusive boyfriend, whose attitude toward the Department of Human Resources hindered the mother's ability to reunite with her children).

On the other hand, when the record contains no evidence indicating that a parent has failed to protect a child from the other parent in the past and contains no evidence indicating that the parent lacks the faculties to recognize a safety threat and to take appropriate measures to protect a child in the future, the finding that the parent lacks protective

CL-2022-1246, CL-2022-1247, CL-2022-1248, CL-2022-1249, CL-2022-1250, CL-2022-1277, CL-2022-1279, CL-2022-1280, CL-2022-1288, and CL-2022-1289

capacity cannot be sustained. In <u>L.M. v. Shelby County Department of Human Resources</u>, 86 So. 3d 377 (Ala. Civ. App. 2011), this court reversed a judgment terminating the parental rights of L.M., the father of three children he shared with J.K., the mother of the children. The Shelby Juvenile Court found the children dependent based on its determination that J.K. could not maintain sobriety for any sustained period and that L.M. would not separate from her. This court concluded that the evidence was insufficient to sustain the judgment because L.M. recognized the dangers to the children when J.K. was under the influence, L.M. had never failed to protect the children from that danger, and L.M. had never been warned that his continued association with J.K. would prevent his reunification with his children. Unlike in <u>L.M.</u>, DHR notified the father that it considered his continued contact with the mother to be an impediment to his unification with the child, but that distinction does not yield a different result. The evidence shows that the father had never failed to protect the child from the mother -- the mother, the father, and the child had never been together at any time. The father recognized

32

that the child should be safe, and he never did anything to threaten the safety of the child by improperly exposing the child to the mother.

We conclude that the father has not committed any act or exhibited any behavior indicating that he had or would jeopardize the safety of the child. At best, the petitioners presented testimony only speculating that the father would give the mother unsupervised access to the child. "'The fear of harm to the child ... must be a real one predicated upon hard evidence; it may not be simply gut reaction or even a decision to err-if-at-all on the side of caution.'" T.J. v. Calhoun Cnty. Dep't of Hum. Res., 116 So. 3d 1168, 1175 (Ala. Civ. App. 2013) (per curiam opinion with Bryan and Moore, JJ., concurring, and Pittman, J., concurring in the result) (quoting In re Jertrude O., 56 Md. App. 83, 100, 466 A.2d 885, 894 (1983)). The evidence cited by the juvenile court in the judgments is not sufficient to prove that the father was unable or unwilling to discharge his protective responsibilities to and for the child.

Section 12-15-310(b) generally requires a juvenile court to dismiss a dependency petition when the allegations of dependency have not been proven by clear and convincing evidence. The petitioners proved the

CL-2022-1246, CL-2022-1247, CL-2022-1248, CL-2022-1249, CL-2022-1250, CL-2022-1277, CL-2022-1279, CL-2022-1280, CL-2022-1288, and CL-2022-1289

allegations against the mother, but not the father. In this circumstance, we believe it is appropriate to reverse the judgments with instructions for the juvenile court to vacate the parts of the judgments finding the child dependent as to the father.

Custody

The mother argues that the juvenile court should not have denied her petition for custody of the child. As explained above, the mother could not assume custody of the child, and the child remained dependent as to the mother. Therefore, we affirm the judgments insofar as they deny the mother's petition for custody.[3]

The juvenile court denied the father's petition for custody, concluding that placing the child in the home of the father was "not in

_____

[3]The mother also argues that the juvenile court erred in awarding the custody of the child to the foster parents instead of to the father. We conclude that the mother lacks standing to appeal the judgments insofar as they deny the father's petition for custody, see G.P. v. Houston Cnty. Dep't of Hum. Res., 42 So. 3d 112, 118 (Ala. Civ. App. 2009), so we do not address her argument. We do address the father's arguments on that point, infra.

34

the best interests and is contrary to the welfare of the child." On January 18, 2022, before DHR determined that the father had violated its no-contact instructions, the juvenile court had adopted a permanency plan calling for the child to be placed into the permanent custody of the father. On February 12, 2022, the juvenile court indicated that it would enter an order transferring custody of the child to the father without the necessity of a hearing if the parties agreed. After DHR discovered that the father had been in communication with the mother, DHR, without petitioning the juvenile court, abandoned that permanency plan and implemented stricter visitation guidelines for the father. From that point forward, DHR opposed the father's custody petition on the ground that the father lacked appropriate protective capacity to serve as a custodian for the child. The trial of the father's custody petition focused almost entirely on whether his contacts with the mother disqualified him from obtaining custody of the child. In its judgments, the juvenile court relied totally on the father's alleged lack of protective capacity to deny his custody petition.

35

As we have explained, the ultimate factual determination that the father lacked protective capacity was not supported by the evidence in the record. Thus, for the same reasons that the juvenile court erred in determining that the child was dependent as to the father, it also erred in determining that it would be contrary to the best interests and welfare of the child to be placed in the home of the father. The evidence shows that, disregarding the unproven allegation of lack of protective capacity, the father was in all other respects fit, willing, and able to assume and exercise custody of the child.

Pursuant to Ala. Code 1975, § 12-15-312(b), once the juvenile court adopted a permanency plan of placing the child with the father, DHR was required to use reasonable efforts to finalize that permanency plan unless the health or safety of the child would be harmed. DHR evidently took the position that it would not be safe for the child to be placed with the father, so, after February or March 2022, DHR did not work toward transitioning the custody of the child to the father; instead, it maintained only limited visitation between the father and the child. The evidence does not support DHR's determination that the child could not safely visit

36

with the father; in fact, in its judgments, the juvenile court ultimately awarded the father increased and unsupervised visitation with the child to take place in the father's home. The ill-advised decision of DHR to limit the visitation between the child and the father thwarted the child and the father's ability to strengthen their developing familial bond.

In similar situations, this court has endorsed plans to transition a child into the custody of a parent through graduated visitation, see, e.g., Ex parte Marshall Cnty. Dep't of Hum. Res., 234 So. 3d 519 (Ala. Civ. App. 2016), and we believe that would be appropriate here. Accordingly, we reverse the judgments insofar as they deny the father's petition for custody of the child, and we remand the cases with instructions for the trial court to vacate the portions of the judgments denying the father's petition and to enter new judgments awarding the father custody of the child and implementing a transition plan that serves the best interests of the child.

## Visitation

The mother argues that the juvenile court erred in limiting her visitation with the child to supervised visitation. This court previously

37

CL-2022-1246, CL-2022-1247, CL-2022-1248, CL-2022-1249, CL-2022-1250, CL-2022-1277, CL-2022-1279, CL-2022-1280, CL-2022-1288, and CL-2022-1289

affirmed the May 17, 2021, judgment that awarded the mother supervised visitation with the child; the November 29, 2022, judgments only continue that restriction. The mother cannot raise on appeal any error committed by the juvenile court in making the initial supervised-visitation award. See Barnwell v. CLP Corp., 264 So. 3d 841, 850 (Ala. 2018) (holding that law-of-the-case doctrine precludes consideration of alleged errors committed in earlier judgment on appeal from subsequent judgment). To the extent that the mother argues that the juvenile court should have awarded her unsupervised visitation based on her current circumstances, we conclude that the juvenile court did not err. This court has recognized that supervised visitation may be mandated when it is deemed necessary to protect a child from an unreasonable risk of physical or emotional harm emanating from the condition of the parent. See, e.g., Pratt v. Pratt, 56 So. 3d 638, 642 (Ala. Civ. App. 2010). For many of the same reasons we have concluded that the evidence supports the determination that the child remains dependent as to the mother, we find that the juvenile court had ample evidence to sustain its determination that the mother's visitation with the child should remain supervised. The

38

CL-2022-1246, CL-2022-1247, CL-2022-1248, CL-2022-1249, CL-2022-1250, CL-2022-1277, CL-2022-1279, CL-2022-1280, CL-2022-1288, and CL-2022-1289

juvenile court could have reasonably determined that the child, who was only two years old at the time of the final hearings, still needed the protection of supervised visitation to assure that the mother would not subject her to an unreasonable risk of harm should her mental health falter. Therefore, we affirm the judgments as to this issue.

The father argues that the juvenile court erred in awarding him visitation with the child, but providing that his visitation would be suspended if he allowed the mother unapproved contact with the child. We have reversed the judgments insofar as they deny the father's petition for custody, but we have ordered the juvenile court to award the father graduated visitation until the child can transition into his full custody. The juvenile court may lawfully impose a condition on the father's visitation requiring him to exclude the mother from contacting the child during his visits, see T.K.T. v. F.P.T., 716 So. 2d 1235 (Ala. Civ. App. 1998), but the juvenile court cannot include a clause automatically suspending the visitation between the father and the child if he violates that condition.

39

CL-2022-1246, CL-2022-1247, CL-2022-1248, CL-2022-1249, CL-2022-1250, CL-2022-1277, CL-2022-1279, CL-2022-1280, CL-2022-1288, and CL-2022-1289

In the judgments, the juvenile court provided, in pertinent part: "All visitation shall be suspended pending a hearing if [the juvenile court] is informed that the father has allowed the mother any form of contact with the child. The mother is given specific rights of visitation and that is all she is awarded at this time." That clause violates our caselaw prohibiting an automatic suspension of visitation. In Webber v. Webber, 854 So. 2d 133 (Ala. Civ. App. 2003), this court reversed a judgment restricting a noncustodial parent from relocating more than 25 miles from the custodial parent's residence because the judgment contained a clause providing that the noncustodial parent's visitation would automatically be suspended upon violation of the restriction. This court reasoned that visitation is awarded based on the best interests of a child and that a court cannot speculate that it would be in the best interests of the child to suspend that visitation based on future circumstances. Rather than impose an automatic suspension that may actually harm the interests of the child in strengthening her bond with the father, the juvenile court could more appropriately sanction the father in a contempt proceeding for violating the no-contact provision or could, through due

40

CL-2022-1246, CL-2022-1247, CL-2022-1248, CL-2022-1249, CL-2022-1250, CL-2022-1277, CL-2022-1279, CL-2022-1280, CL-2022-1288, and CL-2022-1289

process, consider a petition to modify, suspend, or terminate the visitation plan based on such contact. See Barrett v. Barrett, 183 So. 3d 971, 974 (Ala. Civ. App. 2015). Therefore, we reverse the judgments insofar as they allow for automatic suspension of the father's visitation and remand the cases; on remand, the juvenile court is instructed to vacate the provision automatically suspending the father's visitation upon his allowing unapproved contact between the child and the mother and to take such other actions regarding the visitation between the father and the child as are consistent with this opinion.

## The Foster Parents' Appeals

We next address the foster parents' appeals challenging the judgments insofar as they deny their petition to terminate the parental rights of the mother and of the father and their petition to adopt the child.

Because we have concluded that the evidence failed to show that the father was unable or unwilling to discharge his parental responsibilities to and for the child, we conclude that the foster parents did not prove any ground upon which to terminate his parental rights under Ala. Code 1975, § 12-15-319(a). See Ex parte T.V., 971 So. 2d 1

41

CL-2022-1246, CL-2022-1247, CL-2022-1248, CL-2022-1249, CL-2022-1250, CL-2022-1277, CL-2022-1279, CL-2022-1280, CL-2022-1288, and CL-2022-1289

(Ala. 2007) (holding that a petitioner must prove a statutory ground for termination to prevail on termination-of-parental-rights petition). The permanency of the child can be achieved by placing the child with the father, subject to the supervised-visitation rights of the mother, which is a viable alternative to terminating the mother's parental rights. See J.C.D. v. Lauderdale Cnty. Dep't of Hum. Res., 180 So. 3d 900, 901 (Ala. Civ. App. 2015) (holding that awarding custody of children to mother of children and maintaining supervised visitation with father of children was viable alternative to termination of parental rights). We therefore affirm the judgments insofar as they deny the foster parents' petition to terminate the mother's and the father's parental rights.

The juvenile court denied the foster parents' petition to adopt the child because it concluded that the mother and the father had not consented to the adoption as required by former § 26-10A-7(a), Ala. Code 1975, a part of the former Alabama Adoption Code ("the AAC"), former § 26-10A-1 et seq., Ala. Code 1975, which was in effect when the adoption

42

CL-2022-1246, CL-2022-1247, CL-2022-1248, CL-2022-1249, CL-2022-1250, CL-2022-1277, CL-2022-1279, CL-2022-1280, CL-2022-1288, and CL-2022-1289

action was initiated by the foster parents.[4] The foster parents maintain that the evidence proved that the mother and the father both had impliedly consented to the adoption of the child. See Ala. Code 1975, former § 26-10A-2 and § 26-10A-7; and Ala. Code 1975, former § 26-10A-9 (recognizing that a parent may impliedly consent to an adoption).

Former § 26-10A-9, which was in effect when the adoption action was initiated, provided, in pertinent part:

"(a) A consent or relinquishment required by [§] 26-10A-7 may be implied by any of the following acts of a parent:

"(1) Abandonment of the adoptee. Abandonment includes, but is not limited to, the failure of the father, with reasonable knowledge of the pregnancy, to offer financial and/or emotional support for a period of six months prior to the birth.

"(2) Leaving the adoptee without provision for his or her identification for a period of 30 days.

"(3) Knowingly leaving the adoptee with others without provision for support and without communication, or not otherwise maintaining a

_____

[4]The AAC was effective until December 31, 2023. Effective January 1, 2024, the Alabama Minor Adoption Code, § 26-10E-1 et seq., Ala. Code 1975, and the Alabama Adult Adoption Code, § 26-10F-1 et seq., Ala. Code 1975, became effective and replaced the AAC.

43

> significant parental relationship with the adoptee for a period of six months.
>
> "(4) Receiving notification of the pendency of the adoption proceedings under [Ala. Code 1975, §] 26-10A-17[,] and failing to answer or otherwise respond to the petition within 30 days.
>
> "(5) Failing to comply with [Ala. Code 1975, §] 26-10C-1.
>
> "(b) Implied consent under subsection (a) may not be withdrawn by any person."

A finding that a parent had impliedly consented under former § 26-10A-9 to a proposed adoption had to be established by clear and convincing evidence. See Ala. Code 1975, former § 26-10A-25(b)(2) (providing that a probate court shall enter a final judgment of adoption if clear and convincing evidence establishes that all necessary consents have been obtained).

The evidence presented by the foster parents did not clearly and convincingly prove that the mother had abandoned the child or that she had failed to maintain a significant relationship with the child, as the foster parents argue. See S.A. v. M.T.O., 143 So. 3d 799 (Ala. Civ. App. 2013) (holding that mother did not abandon adoptee or fail to maintain a

CL-2022-1246, CL-2022-1247, CL-2022-1248, CL-2022-1249, CL-2022-1250, CL-2022-1277, CL-2022-1279, CL-2022-1280, CL-2022-1288, and CL-2022-1289

significant parental relationship with adoptee by involuntarily losing custody of adoptee and exercising only limited visitation with adoptee as ordered by juvenile court in dependency proceedings). But we need not delve into the evidence to affirm the judgments of the juvenile court insofar as they denied the adoption petition. "Consent" was defined in the AAC as the act of "[v]oluntarily agreeing to adoption." Ala. Code 1975, former § 26-10A-2(4). Former § 26-10A-9 provided that a court "may" find that a parent had consented to the adoption of a child based on the conduct enumerated in that statute. As construed by this court, former § 26-10A-9 did not require a court to find that a parent had voluntarily agreed to the adoption of his or her child by abandoning the child or by failing to maintain a significant relationship with the child for six months; former § 26-10A-9 vested the court with the discretion to consider all the surrounding circumstances when deciding if a parent's actions implied consent to adoption. See, e.g., J.D.S. v. J.W.L., 204 So. 3d 386 (Ala. Civ. App. 2016). The juvenile court exercised its discretion to determine that the mother had not voluntarily agreed to the adoption

45

CL-2022-1246, CL-2022-1247, CL-2022-1248, CL-2022-1249, CL-2022-1250, CL-2022-1277, CL-2022-1279, CL-2022-1280, CL-2022-1288, and CL-2022-1289

of the child based on her actions. The foster parents have not proven on appeal that the juvenile court abused its discretion in that regard.

The foster parents also argue that the father impliedly consented to the adoption of the child by, among other things, failing to comply with Ala. Code 1975, § 26-10C-1, and registering with the Putative Father Registry. We need not consider that issue. Former § 26-10A-7(a)(2) required the consent of the mother to the adoption of the child. Even if the father had impliedly consented to the adoption of the child, the mother had not consented to the adoption, and the absence of her consent alone defeated the foster parents' petition. Former § 26-10A-25(b)(2) provided that a court could grant an adoption only upon finding that "[a]ll necessary consents, relinquishments, terminations, or waivers have been obtained ...." Therefore, whether the father had impliedly consented to the adoption by failing to comply with § 26-10C-1 or otherwise is a moot point.

For the foregoing reasons, we affirm the judgments insofar as they deny the petition of the foster parents to adopt the child.

CL-2022-1246, CL-2022-1247, CL-2022-1248, CL-2022-1249, CL-2022-1250, CL-2022-1277, CL-2022-1279, CL-2022-1280, CL-2022-1288, and CL-2022-1289

Conclusion

In conclusion, we dismiss appeal numbers CL-2022-1248, CL-2022-1249, CL-2022-1250, CL-2022-1277, and CL-2022-1289. In appeal numbers CL-2022-1246 and CL-2022-1247, we affirm the judgments insofar as they determined that the child remained dependent as to the mother, denied her petition for custody, and maintained her supervised visitation with the child. In appeal numbers CL-2022-1279 and CL-2022-1280, we affirm the judgments insofar as they denied the foster parents' petition to terminate the parental rights of the mother and of the father and insofar as they denied their petition to adopt the child. In appeal number CL-2022-1288, we reverse the judgments to the extent that the juvenile court determined the child to be dependent as to the father, denied his petition for custody, and included a provision automatically suspending the father's visitation with the child, and we remand case number JU-21-12.01 to the juvenile court for further proceedings consistent with this opinion.

CL-2022-1249 -- APPEAL DISMISSED.

CL-2022-1250 -- APPEAL DISMISSED.

47

CL-2022-1246, CL-2022-1247, CL-2022-1248, CL-2022-1249, CL-2022-1250, CL-2022-1277, CL-2022-1279, CL-2022-1280, CL-2022-1288, and CL-2022-1289

CL-2022-1277 -- APPEAL DISMISSED.

Thompson, P.J., and Edwards, Hanson, and Fridy, JJ., concur.

CL-2022-1246 -- AFFIRMED.

CL-2022-1247 -- AFFIRMED.

CL-2022-1279 -- AFFIRMED.

CL-2022-1280 -- AFFIRMED.

CL-2022-1289 -- APPEAL DISMISSED.

Edwards, Hanson, and Fridy, JJ., concur.

Thompson, P.J., concurs in the result, with opinion.

CL-2022-1248 -- APPEAL DISMISSED.

CL-2022-1288 -- REVERSED AND REMANDED WITH INSTRUCTIONS.

Edwards, Hanson, and Fridy, JJ., concur.

Thompson, P.J., dissents, with opinion.

CL-2022-1246, CL-2022-1247, CL-2022-1248, CL-2022-1249, CL-2022-1250, CL-2022-1277, CL-2022-1279, CL-2022-1280, CL-2022-1288, and CL-2022-1289

THOMPSON, Presiding Judge, concurring in appeal nos. CL-2022-1249, CL-2022-1250, and CL-2022-1277, concurring in the result in appeal nos. CL-2022-1246, CL-2022-1247, CL-2022-1279, CL-2022-1280, and CL-2022-1289, and dissenting in appeal nos. CL-2022-1248 and CL-2022-1288.

I concur to dismiss appeal numbers CL-2022-1249, CL-2022-1250, and CL-2022-1277. I concur in the result to dismiss appeal number CL-2022-1289 and to affirm the juvenile court's judgments insofar as that court denied the claims asserted by J.R. and A.R. ("the foster parents") seeking to terminate the parental rights of C.S. ("the mother") and J.B. ("the father") and contending that the mother and the father had given implied consent to the foster parents' proposed adoption of A.J.S. ("the child"). I also concur in the result to affirm the juvenile court's judgments insofar as that court determined that the child was dependent as to the mother, denied an award of custody of the child to the mother, and awarded supervised visitation to the mother. However, I dissent from the dismissal of the mother's appeal in appeal number CL-2022-1248 because I would affirm as to that judgment.

49

CL-2022-1246, CL-2022-1247, CL-2022-1248, CL-2022-1249, CL-2022-1250, CL-2022-1277, CL-2022-1279, CL-2022-1280, CL-2022-1288, and CL-2022-1289

I dissent from reversing the juvenile court's judgments insofar as that court found that the child was dependent as to the father. I conclude that, in reaching that holding, this court has impermissibly substituted its judgment for that of the juvenile court.

> "This court is limited in its review of a trial court's judgment when a trial court receives ore tenus evidence. A trial court's judgment resolving disputed ore tenus evidence is entitled to a presumption of correctness on appeal and will not be reversed absent a showing that the trial court exceeded its discretion or that the factual findings upon which the judgment is based are so unsupported by the evidence as to be plainly and palpably wrong. T.D.P. v. D.D.P., 950 So. 2d 311 (Ala. Civ. App. 2006). This '"presumption of correctness is based in part on the trial court's unique ability to observe the parties and the witnesses and to evaluate their credibility and demeanor."' L.L.M. v. S.F., 919 So. 2d 307, 311 (Ala. Civ. App. 2005) (quoting Littleton v. Littleton, 741 So. 2d 1083, 1085 (Ala. Civ. App. 1999)). The determination of the credibility and veracity of the witnesses is the responsibility of the trial court. Earheart v. Earheart, 842 So. 2d 695 (Ala. Civ. App. 2002).

> "We are not allowed to substitute our judgment for that of the trial court, even when this court might have reached a different result, unless the trial court's resolution of the facts is plainly and palpably wrong. L.R.M. v. D.M., 962 So. 2d 864, 873-74 (Ala. Civ. App. 2007) (citing Griggs v. Griggs, 638 So. 2d 916, 918-19 (Ala. Civ. App. 1994), quoting in turn Young v. Young, 376 So. 2d 737, 739 (Ala. Civ. App. 1979)). '"[A]n appellate court may not substitute its judgment for that of the trial court. To do so would be to reweigh the evidence, which

50

Alabama law does not allow."' Ex parte R.E.C., 899 So. 2d 272, 279 (Ala. 2004) (quoting Ex parte Foley, 864 So. 2d 1094, 1099 (Ala. 2003)). When addressing the inability of an appellate court to reweigh the evidence and substitute its judgment for that of the trial court, our supreme court recognized:

> "'The trial court must be allowed to be the trial court; otherwise, we (appellate court judges and justices) risk going beyond the familiar surroundings of our appellate jurisdiction and into an area with which we are unfamiliar and for which we are ill-suited -- factfinding.'

"Ex parte R.T.S., 771 So. 2d 475, 477 (Ala. 2000)."

J.B. v. Cleburne Cnty. Dep't of Hum. Res., 992 So. 2d 34, 39-40 (Ala. Civ. App. 2008).

At the April 27, 2022, portion of the trial, the father denied recalling that Morgan County Department of Human Resources ("DHR") social workers had asked him not to contact the mother, and he represented to the court that, at that time, he had blocked the mother's ability to contact him and was not in contact with her. The evidence at the September 2022 portions of the trial demonstrated that, with knowledge of DHR's disapproval and having experienced the repercussion of having his visitation with the child decreased because of his earlier contact with the

51

mother, the father was again communicating with the mother and that she had been to his home several times. Additionally, the father acknowledged that he had maintained contact and communication with the mother even when his own family members had advised him that doing so might endanger his ability to obtain custody of the child.

The father contends that the evidence does not support the conclusion that the child needs to be protected from the mother. However, in addition to her past drug use, the mother has exhibited behavioral outbursts that have frightened the child and others, and the evidence supports the conclusion that the mother has experienced delusional thinking. Although the mother was obtaining mental-health treatment at the time of the hearings in these matters, she refused to acknowledge that she had a mental-health issue that had resulted in delusions. The mother insisted that the extensive evidence concerning her delusions and bizarre communications with others were the basis of a fictional story or novel that she was attempting to write. The record contains sufficient information to call into question the mother's credibility on that issue. Based on that evidence, the juvenile court concluded that the mother was

a threat to the child. The evidence in the record supports the conclusion that, although he has never asked the mother about her substance-abuse and mental-health issues, the father does not share the same concerns about the child's safety as do DHR social workers, the child's guardian ad litem, and the juvenile court. The primary concern about placing the child with the father was his ability and willingness to protect the child from the mother. The evidence supports the conclusion that the father was dismissing obvious signs of the mother's mental illness, together with the warnings from others, in an effort to pursue a relationship with the mother. That evidence also supports the juvenile court's determination that the father was unwilling to take action to demonstrate that he would protect the child. Given the evidence in the record, particularly the nature of the mother's testimony and the questions regarding the father's credibility, I disagree that the father has shown that the juvenile court erred in determining that the child was dependent as to him. See § 12-15-102(8)6. and 8., Ala. Code 1975. I would affirm the juvenile court's judgments insofar as that court found the child dependent as to the father.

CL-2022-1246, CL-2022-1247, CL-2022-1248, CL-2022-1249, CL-2022-1250, CL-2022-1277, CL-2022-1279, CL-2022-1280, CL-2022-1288, and CL-2022-1289

Regardless, because the main opinion reverses the juvenile court's determination that the child was dependent as to the father, the remaining issues raised by the father should be pretermitted. On remand, the juvenile court will enter new judgments. Therefore, this court's opinion on the issue of custody and visitation to the father in the judgments that are being reversed is dicta.